# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 23, 2014

## IN THE MATTER OF: TERRY S.C., TREVIN S.C., TRUSTIN S.C.

**Direct Appeal from the Juvenile Court for Lincoln County**
**No. J5604A     A. Andy Myrick, Judge**

---

**No. M2013-02381-COA-R3-PT - Filed July 31, 2014**

---

This is a termination of parental rights case. Mother's parental rights were terminated on the grounds of abandonment by willful failure to visit, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(i); abandonment by willful failure to support, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(i); abandonment by failure to establish a suitable home, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(ii); substantial noncompliance with a permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3). We reverse in part and we affirm in part; we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Emeterio "Terry" R. Hernando, Lewisburg, Tennessee, for the appellant, Paula C.

Robert E. Cooper, Jr., Attorney General and Reporter, Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services

# OPINION

## I. FACTS & PROCEDURAL HISTORY

This is a termination of parental rights case involving three male children born in 2000, 2002, and 2004. In November 2004, the Department of Children's Services (the "Department") filed a Petition to Adjudicate Dependency and Neglect against Paula C. ("Mother")[1] based upon Mother's arrest for Assault on an Officer, Disorderly Conduct and Possession of Drug Paraphernalia.[2] The Lincoln County Juvenile Court entered a Court Ordered Safety Plan ordering the children to remain in their current placement with their maternal grandmother ("Grandmother").

Shortly thereafter, however, Grandmother advised the Department that she could no longer care for the children, and the Department filed a Petition for Temporary Custody in November 2004. The juvenile court entered a Protective Custody Order awarding custody of the children to the Department.

In December 2004, a preliminary hearing was held, after which, the juvenile court entered an Order finding probable cause that the children were dependent and neglected. The parties waived the adjudicatory hearing and agreed to a finding, by clear and convincing evidence, that the children were dependent and neglected; custody remained with the Department, with reasonable visitation to Mother and Father.

In December 2004, the Department created permanency plans for each child with the stated goal of return to parent(s)/exit custody to live with relative(s). Mother was required to maintain regular, positive contact with the children; to participate in an alcohol/drug assessment, a psychological evaluation, and a parenting assessment and to follow all recommendations; to obtain/maintain stable housing; and to demonstrate the ability to provide legal financial stability. Mother signed the permanency plans and the plans were ratified in January 2005.

In June 2005, the Department filed a Motion to Suspend Visitation alleging that Mother had acted inappropriately during several visitation sessions. Mother failed to appear at a hearing on the motion, and the juvenile court suspended her visitation until she

---

[1]The petition also named "Unknown Father" as a defendant. The children's legal father ("Father") was later identified. His parental rights were terminated, but he is not a party to this appeal.

[2]The dependency and neglect petition concerned Mother's five children; Mother's parental rights to the eldest two children are not at issue on appeal.

completed in-patient drug rehabilitation and until she could demonstrate the ability to visit the children without acting disruptively. A review hearing was held in July 2005; despite having notice, Mother failed to appear. After which, the juvenile court entered a Review Order finding that Mother was not in substantial compliance with the responsibilities set out in the permanency plans and that her conduct "indicate[d] no desire to cooperate with the Department or to attempt to regain [her] children[.]"

At some point, the children were again placed with Grandmother. The case was reviewed in November 2005, and the juvenile court found placement with Grandmother to be in the children's best interest. The court again found that Mother had not substantially complied with the permanency plans as she had not "completed inpatient rehabilitation or parenting[.]"

On November 16, 2005, the Department filed a Motion for Divestment of Temporary Legal Custody seeking a transfer of custody to Grandmother, who was again caring for the children. Mother failed to appear at the hearing, but over the objection of Mother's counsel, temporary legal custody of the children was awarded to Grandmother.

In June 2007, the children's maternal aunt ("Aunt") filed a Petition seeking custody of the children, claiming that Grandmother could no longer care for them. Grandmother consented, and custody was transferred to Aunt. Mother was incarcerated at the time the Order was entered.

On March 14, 2012, the Department filed a Petition for Temporary Legal Custody and Ex Parte Order. The Petition indicated that Aunt was no longer able to care for the children, that no suitable friend or family member willing to care for the children had been found, and that Mother's whereabouts were unknown. A Protective Custody Order was entered awarding temporary legal custody of the children to the Department.

A preliminary hearing was held in May 2012, after which an Order was entered finding probable cause that the children were dependent and neglected. A Family Permanency Plan was created in April 2012. The plan noted that Mother's whereabouts were unknown. The Family Permanency Plan required Mother to contact the Department to set up visitation,[3] to pay child support, to submit to random drug screens, to participate in a drug/alcohol assessment and a mental health intake and to follow the recommendations, to attend parenting classes, to provide proof of stable housing and legal income, and to provide the Department with a list of prescription medications and to submit to random pill counts. Following a hearing on May 30, 2012, the Family Permanency Plan was ratified in a

---

[3]The Department was also responsible for setting up visitation.

Permanency Plan Ratification Order; it indicated that Mother "had notice and failed to appear[.]"

Mother was subsequently located in Louisiana and, in June 2012, the juvenile court entered an Interstate Compact on the Placement of Children ("ICPC") Priority Placement Order requiring the Department to transmit the priority placement request to Louisiana.

In July 2012, the juvenile court entered a Final Order of Adjudication and Disposition, finding the children dependent and neglected by clear and convincing evidence. The order noted that Mother, who was residing in Louisiana, had been in contact with the Department and that an effort was being made to determine if Mother's home was appropriate for the children.

A second Family Permanency Plan was entered in September 2012; it added adoption as a secondary goal. Similar to the previously-entered plans, the second Family Permanency Plan required Mother to contact the Department to set up visitation, to pay child support, to submit to random drug screens, to participate in a drug/alcohol assessment and a mental health intake and to follow the recommendations, to attend parenting classes, to provide proof of stable housing and legal income and to provide the Department with a list of prescription medications and to submit to random pill counts. The second Family Permanency Plan was ratified; Mother had notice and failed to appear.

A permanency hearing was held on March 6, 2013; Mother had notice and failed to appear. In its Permanency Hearing Order, the juvenile court ordered that, due to the parents' failure to make progress, the permanency plan goal should be changed to "a sole goal of adoption." It found that the Department was making reasonable efforts to assist Mother, but that Mother was not in substantial compliance with the permanency plan. Specifically, it noted that Mother's "ICPC home study was not approved, she has not visited the children or maintained contact with her DCS caseworker[.]"

On April 9, 2013, the Department filed a Petition to Terminate Parental Rights against Mother in the Lincoln County Juvenile Court. The petition alleged five grounds: abandonment by willful failure to visit, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(i); abandonment by willful failure to support, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(i); abandonment by failure to establish a suitable home, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(ii); substantial noncompliance with a permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3).

A trial was held on August 23, 2012 wherein Mother was represented by appointed counsel. On September 6, 2013, the juvenile court entered a thorough Order terminating Mother's parental rights on all grounds alleged in the petition. The Order was certified as final pursuant to Tennessee Rule of Civil Procedure 54.02. Mother appeals.

## II. ISSUES PRESENTED

Appellant presents the following issues for review, as summarized:

1.     Whether grounds for termination exist;

2.     Whether the trial court erred in denying Mother's motion for a mental evaluation; and

3.     Whether termination is in the children's best interest.

For the following reasons, we affirm in part and we reverse in part; we affirm the termination of Mother's parental rights.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clause of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is

in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(I). ***In re Audrey S.***, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. ***Id.*** at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." ***In re L.J.C.***, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. ***In re Audrey S.***, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). ***In re Audrey S.***, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. ***Id.*** Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. ***Id.*** Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. ***In re R.L.F.***, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Grounds for Termination

As stated above, the trial court found that all five grounds alleged in the termination petition–abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, substantial non-compliance with a permanency plan, and persistence of conditions–had been proven by clear and convincing evidence. On appeal, Mother challenges each of those grounds. Mother's grounds argument, in its entirety, is as follows:

> [Mother] testified in her behalf. She said she tried to talk over the phone and to visit with her children ever since they came into temporary custody even when she was living in Louisiana starting in 2007 but that she

-6-

was always "shut off" by her sister who had custody at the time. She said she had not paid child support for her children because the court has not ordered her to do so, all during the time the children were in temporary custody of the Department and/or her relatives. She said that she had been a victim of severe domestic abuse and suffers from post-traumatic stress syndrome, mood disorder and various chronic pains. She said that she can now provide a stable home for her children and although she admits that where she lives right now is small and may be crowded if her children will live with her, she stated that she and her fiancé are looking for a bigger place. She is also trying to get a more stable and gainful employment. She also testified that she had a hard time attending the Permanency Plan meetings because she was living in Louisiana at the time and did not know that she could participate by telephone because the Department did not advise her of that option. She also said that she has completed her intensive alcohol and drug (A & D) outpatient program assessment and even still goes and attends to this day on her own volition.

We note that Mother's argument is woefully insufficient. It provides no citations to authority nor any explanation as to how the recited portions of Mother's testimony render termination erroneous.

Tennessee Rule of Appellate Procedure 27 provides that an appellant's brief "shall contain" in part:

(7) An argument, which may be preceded by a summary of argument, setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]

"It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." ***Sneed v. Board of Prof'l Resp. of Supreme Court***, 301 S.W.3d 603, 615 (Tenn. 2010) (citing Tenn. R. App. P. 27(a)(7)). However, we may "waive the express briefing requirements for good cause" pursuant to Rule 2 of the Tennessee Rules of Appellate Procedure. ***See Diggs v. Lasalle Nat. Bank Ass'n***, No. W2013-01121-COA-R3-CV, 2013 WL 5232316, at *5 (Tenn. Ct. App. Sept. 17, 2013) *perm app. denied* (Tenn. Dec. 10, 2013). Due to the gravity of the issue at hand, we exercise our discretion to consider whether grounds for termination were

proven by clear and convincing evidence.[4]

### 1. Abandonment

The first ground for termination listed in the statute, and the one most frequently relied upon, is abandonment. ***In re Audrey S.***, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(I)-(v). The three definitions relevant in this case provide that "abandonment" means that:

> (I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

> (ii) The child has been removed from the home of the parent(s) . . . as a result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) . . . to establish a suitable home for the child, but that the parent(s) . . . have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

**Tenn. Code Ann. § 36-1-102(1)(A)(i)-(ii)**.

---

[4]Curiously, due to the inadequacies of Mother's brief, the Department chose to address, in its brief, only the ground of abandonment by willful failure to visit.

Abandonment can be established by showing that a parent either willfully failed to visit or willfully failed to provide support. ***See In re Audrey S.***, 182 S.W.3d at 863 ("In the statutes governing the termination of parental rights . . . . [w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.") (citations omitted). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." ***Id.*** at 864 (footnote and citations omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Mark A.L.***, No. M2013-00737-COA-R3-PT, 2013 WL 5536801, at *3 (Tenn. Ct. App. Oct. 4, 2013) (citing *In re Adoption of Angela* E., 402 S.W.3d 636, 639 (Tenn. 2013)).

In this case, the termination petition was filed on April 9, 2013; thus, the relevant four-month period under subsection (i) extends from December 9, 2012 to April 9, 2013.

### a. Failure to Visit

Regarding abandonment by failure to visit, the juvenile court found as follows:

> The Court [] concludes that [Mother] has abandoned the children in that she willfully failed to visit or to engage in more than token visitation for four consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights. There was undisputed testimony that [Mother] had last seen her children in 2011. [Mother] testified that she had not had a regular relationship with the children from the time they exited DCS custody in 2005 until the present. [Mother] testified that her first visitation with the children occurred in April 2013, after the filing of the TPR Petition. [Mother] further testified that she had moved to Louisiana in 2009, knowing that the children were living with her relatives and the she would not be able to see them on a regular basis if she moved away. [Mother] testified that moving away from her children was better for her, even though she had lived for a while in Alabama, where [Aunt] resided with the children [sic].

> The Court further finds that [Mother] had been repeatedly notified of the consequences of abandonment of the children.

At trial Mother acknowledged that, prior to the filing of the termination petition in April

2013, she had not visited the children since 2011.[5]  On appeal, Mother seems to argue that her failure to visit was not willful because she attempted to visit the children and to contact them via telephone, but such efforts were thwarted by Aunt.

"Failure to visit a child is 'willful' when a parent is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  *In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5586801, at *6 (Tenn. Ct. App. Oct. 4, 2013) (citing *In re Adoption of Angela E.*, 402 S.W.3d at 639); *see also In re Audrey S.*, 182 S.W.3d at 863 ("In the statutes governing the termination of parental rights, 'willfulness' does not require the same standard of culpability as is required by the penal code.  Nor does it require malevolence or ill will.  Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.") (citations omitted).  "'A parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child.'"  *Id.* (quoting *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)).

At trial, Mother testified that during 2005, she lived in Fayetteville, Tennessee, and struggled with a drug and alcohol problem.  In 2007, she followed a job to Louisiana, which ended shortly after her move.  Mother's move out of state violated her probation for DUI and she was returned to Tennessee to serve an eight month sentence in the Lincoln County Jail.  After her release, Mother moved to Alabama where she worked in a fast food restaurant and lived in a homeless shelter.  The job lasted only a few weeks and Mother returned to Louisiana where she took another job which was, again, short-lived.  In Louisiana, Mother lived in homeless shelters and missions until approximately 2011 when she moved in with her now-fiancé.  At trial, Mother stated that she "d[id]n't know" why she had not moved closer to her children.

At the termination trial, Mother testified that she has a strained relationship with Aunt and that Aunt would not allow her to see the children.  However, the children only lived with Aunt between June 2007 and March 2012–not during the relevant four month period of December 9, 2012 to April 9, 2013.  Mother testified that she was made aware, in May 2012,[6] that the children were no longer in Aunt's care, yet she did not attempt to visit.  The record clearly demonstrates that Mother willfully failed to visit the children, without justifiable

---

[5]Mother testified that, in 2011, she visited the children at a relative's house; the Department was apparently not involved.

[6]Statutory notice must be given before parental rights can be terminated on the ground of abandonment.  *See* **Tenn. Code Ann. § 37-2-403**.  At trial, Mother acknowledged receiving and signing a notice informing her that her parental rights could be terminated for failure to visit.

excuse, during the four-month period preceding the termination petition. Accordingly, we find the Department successfully proved the ground of abandonment by failure to visit, Tenn. Code Ann. § 36-1-113(g)(1), 36-1-102(1)(A)(I).


b. Failure to Support

Regarding abandonment by failure to support, the juvenile court found, in pertinent part:

The Court concludes that [Mother has] abandoned the children by willfully failing to support or make reasonable payments toward the support of the children for four (4) consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights.

. . . .

[Mother] testified that she had not made any child support payments because there was no Court Order requiring her to pay support. [Mother] further testified that she had given the children birthday cards over the years. The Court finds this to be token at best.

[Mother] further testified that she had been employed at a string of jobs over the years and that she was currently unemployed and doing odd jobs. [Mother] testified that she had been unable to maintain stable employment.

The Court concludes that [Mother] is able bodied and capable of working and earning enough to support herself as well as paying child support.

On appeal, Mother attempts to argue that she did not willfully fail to support her children because the court had not ordered her to pay support. The Family Permanency Plan entered in April 2012 and ratified by the juvenile court, which Mother acknowledged receiving, required Mother to contact the Tennessee Child Support Division and ask that her case be placed on the docket for assignment of child support according to the Tennessee Support Guidelines. In any event, this Court has expressly rejected the argument that a parent is excused from paying child support in the absence of a court order compelling that support payments be made. "'[T]he obligation to pay support exists even in the absence of a court order to do so.'" *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *8 (Tenn. Ct App. Nov. 19, 2013) (quoting *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004)). In fact, "Tennessee Code

Annotated [section] 36-1-102(1)(H)[7] explicitly states . . . that '[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children.'" *Id.* (quoting Tenn. Code Ann. § 36-1-102(1)(H)).

Although the purported absence of a court order does not excuse Mother from supporting her children, we find that the Department has not demonstrated, by clear and convincing evidence, that Mother abandoned the children by willfully failing to support them. As stated above, "in order to prove the ground of abandonment for failure to support, the petitioner must establish by clear and convincing evidence that the parent who failed to support 'had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so.'" *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *17 (Tenn. Ct. App. Apr. 17, 2014) (quoting *In re Adoption of Angela E.*, 402 S.W.3d at 640).

It is undisputed that Mother did not pay any child support for the children during the relevant four-month period. Mother testified at trial that she is capable of working, that she has worked as a painter, a janitor, and a day laborer, and that she has worked doing odds jobs and in a convenience store. However, she further testified that she has been unable to secure a regular, full-time job in order support the children and that her previous employment has provided some income, "but not a whole lot of it[.]" The Department failed to present any evidence regarding Mother's income, her expenses, or her support obligation. As this Court has previously found, "[i]t was not enough for [the Department] to simply prove that Mother was not disabled during the relevant timeframe." *Id.* at *18. Accordingly, we reverse the trial court's finding that grounds for termination existed based upon abandonment by failure to support.

c. Failure to Provide a Suitable Home

"A 'suitable home requires more than a proper physical living location.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.*

The juvenile court found that Mother had failed to provide a suitable home for the

---

[7]This statute bears an effective date of May 26, 2010.

children as follows:

The Court concludes that [Mother] has abandoned these children by failing to provide a suitable home. The Court finds that the children were found to be dependent and neglected by the Juvenile Court of Lincoln County, Tennessee[,] and were placed in the custody of the Department of Children's Services in 2004. [Mother's] home was the removal home in 2004 and the children resided with interim caregivers, [Grandmother and Aunt], after being discharged from foster care. The children were again removed into foster care in 2012 from the home of [Aunt]. The Court finds that each of the Juvenile Court's protective custody orders approving the removals found that the Department could not make reasonable efforts to prevent removal due to the children's circumstances. The Court further finds that the Department made reasonable efforts to assist [Mother] to establish a suitable home by providing services pursuant to the initial permanency plans, and by seeking an ICPC home study and ICPC Priority Placement Order to have [Mother's] home approved for placement of the children. Despite assistance from the Department and available social services agencies for when she advised social workers in Louisiana that her housing was not adequate for the children and that she was unable to meet their basic needs [sic].

[Mother] testified that she did not [have] employment sufficient to meet her children's basic needs. [Mother] testified that she left Tennessee in order to maintain a job but that traveling to Louisiana with that job resulted in a violation of her probation and that as a result she had to serve eight months in the Lincoln County Jail upon her return to Tennessee. [Mother] testified that after serving her jail sentence, she determined that she had done better in Louisiana, and that she returned to Louisiana to find work while she stayed in a shelter. [Mother] testified that she did not understand why the children could not come stay with her in the shelter. [Mother] testified that she had been unable to maintain a steady job, but that she had managed to obtain temporary and day-labor jobs sufficient to support herself. [Mother] testified that even when she had income, she did not provide any support for the children because there was not a Court Order requiring her to pay support.

[Mother] testified that she was addressing her mental health needs through the Jefferson Parish Human Services Authority[, in Louisiana,] where she received medication for mental health problems. [Mother] testified that she had not advised DCS representatives that she was obtaining mental health treatment at this facility and had not signed a release of information so that the

Department could obtain those records for purposes of verification. [Mother] did not provide proof of mental health treatment.

[Mother] testified that she was also receiving alcohol and drug treatment through the Jefferson Parish Human Services Authority and that she had not advised the Department that she was receiving ongoing treatment from this facility and had not provided a release of information so that Department representatives could obtain these records for purposes of verification. [Mother] testified that she had completed alcohol and drug treatment on February 10, 2012, and provided a certificate of completion.

On appeal, Mother seems to argue that the trial court erred in terminating her parental rights on the ground of abandonment by failure to provide a suitable home because she is now able to provide a stable home for her children and because she is currently searching for a larger home.

As set out above, Tennessee Code Annotated section 36-1-102(1)(A) requires that when termination is based on abandonment by failure to provide a suitable home, the Department must, "for a period of four (4) months following the removal," make "reasonable efforts[8] to assist the parent(s) . . . to establish a suitable home for the child[.]"[9] Here, the children were removed from Mother's custody on or about October 23, 2004; thus, the relevant period is from October 23, 2004 to February 23, 2005.

The Department's Affidavit of Reasonable Efforts, filed on November 17, 2004, indicates that "Family support services had been referred to [the parents'] home and the mother did not cooperate with these services." A January 5, 2005 Order of Adjudication and Disposition found that the Department had provided reasonable efforts on behalf of the family. There is no indication, however, that the Department made any efforts *related to suitable housing* during the relevant period. Accordingly, the Department failed to prove that Mother abandoned the children under Tennessee Code Annotated section 36-1-102(1)(A)(ii) by failing to provide a suitable home.

---

[8]Tennessee Code Annotated section 36-1-102(1)(A)(ii) provides that "[t]he efforts of the department . . . to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department."

[9]We note that Mother does not challenge the reasonableness of the Department's efforts with regard to providing a suitable home. Out of an abundance of caution, however, we address such efforts.

## 2. Substantial Non-Compliance with a Permanency Plan

Parental rights may be terminated upon finding clear and convincing evidence that "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" **Tenn. Code Ann. § 36-1-113(g)(2)**. "Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. Rather, "[t]o succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citations omitted). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* at 656-57 (citations omitted). "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

Again, under the permanency plans, Mother was required to contact the Department to set up visitation, to pay child support, to submit to random drug screens, to participate in a drug/alcohol assessment and a mental health intake and to follow the recommendations, to attend parenting classes, to provide proof of stable housing and legal income and to provide the Department with a list of prescription medications and to submit to random pill counts.[10]

In its Order Terminating Parental Rights, the juvenile court found that Mother's non-compliance with the permanency plan was substantial–namely, she had not secured a steady job with income sufficient to support the children and she had not provided proof of mental health treatment.

As discussed above, at trial, Mother conceded that she had failed to set up visitation or to pay child support. She further testified that she had searched for, but been unable to secure, stable, full-time employment and she agreed that it is "iffy" whether she will be able to secure a job in order to financially support the children. She testified that she has lived with her now-fiancé for approximately two to three years, but she acknowledged that the couple lives a three room apartment–a kitchen, bathroom, and combination living room/bedroom–and that its small size renders it unsuitable for three children. Mother stated,

---

[10]At trial, the Department conceded that, because Mother lived in Louisiana, she was unable to submit to random pill counts. Mother's failure to comply with this requirement, therefore, will not be considered negatively on appeal.

however, that if given the chance, she would ensure that her children had food and shelter.

At trial, Mother admitted that she was aware of the requirement that she complete parenting classes; however, she conceded that she had not done so. She claimed that she had been receiving mental health treatment for two and one-half years, but she stated that she forgot to obtain proof of treatment and she never signed a release allowing the Department to obtain her mental health records. Mother did, however, provide proof of attending a 90-day drug and alcohol treatment program, and she testified that she continues to attend Narcotics Anonymous/Alcoholics Anonymous meetings. She stated that she had not provided prescription drug information to the Department, but she could not recall ever receiving a request for such.

On appeal, Mother seems to argue that she complied with the requirements set forth in the permanency plans because she is searching for a larger home and stable income, and because she completed, and still attends, a drug and alcohol treatment program. Essentially, Mother has completed only one of the many important tasks required of her pursuant to the permanency plans, each of which we find reasonable and related to remedying the conditions that caused the children to be removed from Mother's custody in the first place. ***See In re M.J.B.***, 140 S.W.3d at 656. Notably, she has failed to secure stable employment or appropriate housing, to pay child support, to attend parenting classes, or to visit with the children in order to establish a relationship with them. In sum, we find Mother's non-compliance with the permanency plans was substantial.

### 3. Persistence of Conditions

In addition to abandonment and substantial non-compliance with a permanency plan, the juvenile court found that the Department had established by clear and convincing evidence the ground for termination commonly referred to as "persistent conditions" which is set forth in Tennessee Code Annotated section 36-1-113(g)(3)(A)-(C):

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

-16-

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In cases involving the "persistence of conditions" ground, the Department is not required to prove that a parent-child relationship cannot be salvaged, nor is the Department required to show that a parent is "currently harmful" to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). "The question herein is the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care with weekly visits with the [parent]." *Id.* The termination of parental rights statutes recognize a child's need for a permanent, stable environment. *Id.* A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). Where efforts to provide help to improve parenting abilities have been offered over a long period of time and have proved ineffective, "the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

The juvenile court's findings on this ground are as follows:

> The Court concludes by clear and convincing evidence that the children have been removed from [Mother's] home by order of the Juvenile Court of Lincoln County for a period greater than six (6) months, in fact, almost nine years, and that conditions exist in the home which prevent the children's return to [Mother.] There is little likelihood that these conditions would be remedied at an early date so that the children could be returned to the parents. The Court further concludes that the continuation of the parent child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home.

> The Court finds that [Mother] has not obtained stable housing sufficient to provide for the children for over nine years, despite [Mother's] own admission that her housing was not suitable for the children. The Court finds that [Mother] testified that she "just needed a little time" to obtain better housing so that the children could be placed with her. The Court further finds

-17-

that [Mother] had not maintained regular contact with her children, even prior to the current involvement by the Department of Children's Services and testified that she had not seen the children from 2011 to 2013. Despite [Mother's] assertions that she was not aware that the Department would allow her to visit with the children, [Mother] evidenced no intent to visit with the children during the year prior to the children's placement into foster care. In addition, although [Mother] asserted that she was not aware that she could visit with the children, she testified that she asked for the children to be brought to Louisiana to visit and that she had requested to visit once every three months.

The children in this case were removed from Mother's custody nearly a decade ago. Yet, at the time of trial, Mother continued to ask for more time in order to get her act together. Again, she acknowledged that she did not have stable, sufficient income to provide for the children, nor did she have suitable housing. A Department family service worker conceded that Mother had made progress since the children's exit from her custody, but she had failed to make significant adjustments to allow the children to return to her care. Simply put, these children have lingered in foster care long enough. They deserve a permanent, safe and caring environment which Mother has been, and is currently, unable to provide.

### B. Reasonable Efforts

As noted above, Mother does not argue that the Department failed to make reasonable efforts toward reunification in this case. However, due to the consequences of a termination action, we will examine the efforts exerted.

"It is well-established that once DCS removes a child from the custody of its parents, absent some factor in the home that exposes the child to 'substantial risk of harm,' DCS is obligated to make ''reasonable efforts' to make it 'possible for the child to return safely to the child's home.'" *In re T.C.E.*, No. E2010-02031-COA-R3-PT, 2011 WL 2553302, at *8 (Tenn. Ct. App. June 28, 2011) (quoting Tenn. Code Ann. § 37-1-166; *In re C.M.M.*, No. M2003-011220-COA-R3-PT, 2004 WL 438326, at *6 Tenn. Ct. App. Mar. 9, 2004)). "'Termination proceedings based on the ground in Tenn. Code Ann. § 36-1-113(g)(1)-(3) generally require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents.'" *Id.* (quoting *In re C.M.M.*, 2004 WL 438326, at *6, n.27).

The Department's duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re Steven P.D.*, 2012 WL 3025151, at *9 (quoting Tenn. Code Ann. § 37-166(g)(1)). In considering the Department's efforts, the courts consider the following factors:

(1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*Id.* at \*10 (quoting *In re Giorgianna H.*, 205 S.W.3d at 519). "Courts should decide the reasonableness of DCS's efforts 'on a case-by-case basis in light of the unique facts of the case.'" *Id.* (quoting *In re Bernard T.*, 319 S.W.3d at 601). The Department must prove, by clear and convincing evidence, that its efforts were reasonable. *Id.* (citing *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at \*9 (Tenn. Ct. App. June 9, 2004)).

The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). DCS employees must affirmatively and reasonably utilize their education and training to help parents eliminate the conditions requiring removal of their children and to meet the responsibilities of their permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316 (citations omitted). DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at \*7). "While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519 (citation omitted).

The legislature, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id.* (citations omitted).

*Id.*

In this case, Department family service worker, Kristin Conley, testified that the Department conducted a diligent search to locate Mother, whose whereabouts were often unknown. In August 2012, the Department attempted to arrange an ICPC home study of Mother's Louisiana home to discern whether it was a suitable placement for the children; however, according to Ms. Conley, the placement was denied because the apartment was not rented to Mother, because Mother indicated that it was too small for the children, and because Mother did not return phone calls or maintain contact with the persons attempting to perform the home study. Ms. Conley further testified that prior to April 2013, her contact with Mother was "very sporadic and quite at times incoherent and not conducive to discussing any specifics other than [Mother] being upset about something[.]" Ms. Conley testified that if Mother left a phone number, when she attempted to call the number, she was unable to reach Mother and that Mother "did not maintain regular contact with the Department in order to be a participant in the things that were going on on a regular basis with the children." Ms. Conley conceded that she was not aware of any services set up by the Department for Mother in Louisiana; however, she explained that this was because Mother did not maintain contact with the Department until April 2013 and, at that time, Mother reported to the Department that she had already obtained the necessary services.

Regarding visitation, Ms. Conley testified that she explained to Mother "on several different occasions on the telephone" that she could come to Tennessee to visit the children and to contact the Department so that visitation could be arranged. She stated, "I can testify with certainty that if [Mother] had requested visitation and she was in the State of Tennessee, I would have made every effort to ensure that she was given that visitation." In fact, when Mother returned to Tennessee after the termination petition was filed, the Department set up weekly therapeutic sessions, and provided Mother with transportation thereto, until Mother returned to Louisiana.

As this Court has stated, "DCS cannot be expected to work miracles in the face of [] dogged resistance to being assisted." *In re Zeylon T.S.*, E2011-00287-COA-R3-PT, 2011 WL 5052957, at *10 (Tenn. Ct. App. W.S. Oct. 24, 2011). In this case, Mother's transient lifestyle essentially prevented the Department from providing her with services related to her issues with drug and alcohol abuse, mental illness, housing, parenting and unemployment. Mother's choice to remain in Louisiana prevented her from seizing the Department's offers to schedule visitation, and her insistence that she had secured services herself ostensibly rendered further efforts by the Department unnecessary. In sum, the record clearly and convincingly demonstrates that the Department's efforts were reasonable under the circumstances.[11]

---

[11]This finding of reasonable efforts, of course, excludes our above-finding that the Department did
(continued...)

### C. Mental Evaluation

At the termination trial, Mother testified, without corroborating documentary evidence, that she had been receiving mental health counseling for two and one-half years, that she had been diagnosed as having post-traumatic stress disorder[12] and a "mood disorder[,]" and that she was currently taking prescribed medications for a sleep disorder as well as antidepressants. In response to Mother's testimony, Mother's counsel orally moved at trial for a mental evaluation of Mother. Mother's counsel indicated that she first met with Mother four days prior to trial and that she was previously unaware of Mother's alleged mental diagnoses. The juvenile court denied Mother's counsel's motion, and Mother challenges the denial as error on appeal.

"The question of witness competency is a matter for the trial court's discretion, and the trial court's decision will not be overturned absent abuse of that discretion." *State v. Nash*, 294 S.W.3d 541, 548 (Tenn. 2009) (citing *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993)). "Under Tennessee Rule of Evidence 601, "'[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute.'" *Id.* Moreover, "[t]he granting of a continuance lies within the sound discretion of the trial court." *State v. Schmeiderer*, 319 S.W.3d 607, 617 (Tenn. 2010) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)).

In denying Mother's counsel's motion to halt the trial to conduct a mental evaluation of Mother, the juvenile court stated:

> I've not noticed really anything unusual about [Mother's] testimony. I mean she answers questions a bit slow, but that's not unusual. Her answers seem to be coherent.
>
> . . . .

---

[11](...continued)
not make reasonable efforts during the relevant four-month period with regard to the ground of abandonment by failure to provide a suitable home. To be clear, we find the department made reasonable efforts with regard to the grounds of abandonment by failure to visit, abandonment by failure to support, substantial non-compliance with a permanency plan, and persistent of conditions.

[12]Mother testified that she suffered from post-traumatic stress disorder after witnessing a friend shoot himself while playing Russian Roulette and after witnessing her son's biological father die from a massive heart attack.

I'm not convinced that we have the grounds here for a mental evaluation. I have to weigh that against these children's need to have these type cases processed quickly. I think that's clear in the law that we should get these cases done as quickly as we can so that they can get on with their lives.

I don't see anything to indicate that she is suffering from a mental condition to the extent that we need the mental evaluation. She appears to be coherent. She appears to understand questions. She's testified in a coherent manner. I think she understands why she's here today. So I'm going to deny the motion and we're going to move forward.

We find that the juvenile court did not abuse its discretion in denying Mother's request to halt the trial for a mental evaluation. In so finding, we note that the ground of mental incompetence was not pled against Mother and that the Department made no allegation that she was mentally unfit to care for the children. Moreover, Mother had the opportunity to obtain a mental health evaluation–in fact, the permanency plans required her to complete a mental health intake–and she even claimed, at trial, that she had been receiving mental health treatment for over two years; she failed to provide proof to substantiate these claims. Additionally, at trial, Mother acknowledged that she was given her attorney's contact information in April 2013–four months prior to trial–yet she was simply "not sure" why she failed to contact her attorney until the week of trial. Perhaps paramountly, the juvenile court, with the benefit of hearing Mother's testimony and observing her demeanor, found Mother to be coherent. Under these circumstances, we find no abuse of discretion.

### D. Best Interest

"[H]aving found a ground for termination of parental rights, a trial court is required to consider, as we must on review, whether termination of those rights is in the child's best interest." *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *11 (Tenn. Ct. App. Nov. 19, 2013) (citing Tenn. Code Ann. § 36-1-113(I); *In re Audrey S.*, 182 S.W.3d at 877).

In evaluating the child's best interest, we are to consider numerous factors including, but not limited to, those set forth in Tennessee Code Annotated section 36-1-113(I):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment

-22-

after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parents or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In its Order Terminating Parental Rights, the juvenile court made express findings regarding the best interest factors, as follows:

The Court concludes that termination of [Mother's] parental rights to the children is in the children's best interests. The Court concludes that Tenn. Code Ann. § 36-1-113(i)(2) is present in that [Mother] has [not] made such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in [Mother's] home despite reasonable efforts by available social service agencies for such duration of time that lasting

-23-

adjustment does not reasonabl[y] appear possible; that Tenn. Code Ann. § 36-1-113(i)(3) is present in that [Mother] ha[s] not maintained regular visitation or other contact with the children; that Tenn. Code Ann. [§] 36-1-113(i)([4]) is present in that there is no meaningful relationship between the children and [Mother]; that a change of caretakers resulting in a return to [Mother] is likely to have a negative effect on the children; and that Tenn. Code Ann. § 36-1-113(i)(9) is present in that [Mother] [has not] paid child support consistent[] with the child support guidelines promulgated by the Department of Human Services pursuant to Tenn. Code Ann. § 36-5-101 when financially able to do so. Further, the Court concludes that termination of [Mother's] parental rights is in the best interests of the children because [she has] shown little or no interest in the welfare of the children.

Thus, the Court concludes that several factors under § 36-1-113(i) are present. Accordingly, termination is clearly in the children's best interest.

The trial court's best interest determination is a conclusion of law which we review *de novo* with no presumption of correctness. **In re Z.V.S.P.**, No. M2009-00058-COA-R3-PT, 2009 WL 1910919, at *17 (Tenn. Ct. App. July 1, 2009) (citing Tenn. R. Civ. P. 13(d)).

At trial, Department family service worker Kristin Conley testified that the children are in a loving, pre-adoptive foster home. The foster parents allow the children to maintain contact with their other siblings and relatives and they involve the children in extracurricular activities. Ms. Conley opined that termination is in the children's best interest because the children lack a meaningful relationship with Mother, because a change of caretaker would negatively affect their behavior, and because "[t]his is the first stability they have known in their entire lives that they have maintained and said they want this." Ms. Conley acknowledged that Mother has expressed love for the children; however her concern has not manifested in her actions. Ms. Conley testified, "The children have not been in [Mother's] care for so long that they do not remember being in her care and the children have stated repeatedly that they are ready to move forward and they want to be adopted."

Ms. Conley further testified that, despite being given the opportunity to do so and being notified of the consequences of failing to do so, prior to the 2013 termination petition, Mother had not visited the children since 2011. Mother reported to Ms. Conley after the petition was filed, that she continued to lack suitable housing and income and that she remained unable to properly care for the children. Ms. Conley noted that Mother had failed to provide support for the children or to attend parenting classes.

Pam Arnell, an expert in counseling who supervised Mother's 2013 visitation with the children–five, three-hour visits–also testified at trial. She stated that Mother has no bond with the children; "They know that she is their mother and they respect that she is their mother, but there's not a bond because they have not had contact with her." She opined that it would be "extremely difficult" for Mother to establish a bond with the children due to their ages–thirteen, eleven, and nine–and the length of time without contact. Ms. Arnell testified that the children have a "strong bond" with their foster parents, that they feel safe with their foster parents, and that they wish to be adopted. Ms. Arnell completed a Risk Assessment Scale of Abuse with regard to Mother and she testified that Mother's score indicated a "high potential for potential neglect in the future."

The oldest child, who was thirteen years old at the time of trial, also testified. He stated that he "[k]ind of" wants to be adopted, but also that he "never really wanted to be adopted." Similarly, he stated that he wishes to live with Mother although he also wants to live with his siblings. He testified that he had been living in his current foster home for one and one-half years, and that he "sometimes" likes to live there although his foster parents are "really strict" and his foster father is "just kind of mean sometimes." The child became upset during his testimony, and the Department stipulated that the children and Mother love each other.

At trial, Mother conceded that she did not have sufficient income to support the children, but she claimed that she is searching for employment. Mother claimed that she has been drug and alcohol free for three years, she passed a drug test on the day of trial, and she submitted a certificate evidencing completion of a ninety-day drug and alcohol program. However, she conceded that she had not attended parenting classes although she knew she needed to, that she had not provided proof of mental health treatment, and that her current home is not large enough to house the children. She further acknowledged that she had not exercised the visitation she would have been allowed had she remained in contact with the Department and she admitted that she last had a substantial relationship with the children in 2004, the year the youngest child was born.

Based upon the foregoing, we readily conclude that termination of Mother's parental rights is in the best interest of the children. The Department has demonstrated that a change of caretakers would be detrimental to the children. Mother has failed to provide support for the children, she has failed to make a lasting adjustment and such adjustment does not reasonably appear possible, and, perhaps most importantly, she has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them.

## IV. CONCLUSION

For the aforementioned reasons, we affirm in part and we reverse in part; we affirm the termination of Mother's parental rights. Costs of this appeal are taxed to Appellant, Paula C., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.